RONALD G. CONGELLIERE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Congelliere v. Commissioner
Docket Nos. 34413-84, 34499-85, 34853-85, 6432-86
United States Tax Court
T.C. Memo 1990-265; 1990 Tax Ct. Memo LEXIS 284; 59 T.C.M. (CCH) 709; T.C.M. (RIA) 90265; May 30, 1990, Filed *284 An order will be entered dismissing docket no. 34499-85 as to Charlotte Congelliere and docket No. 6432-86 as to Ronald Congelliere, and decisions will then be entered under Rule 155. Ronald G. Congelliere and Mark S. McFarlane, pro se. Patrick McGinnis and Sheri Hinnant, for the respondent. SCOTT, Judge. SCOTT *974 MEMORANDUM FINDINGS OF FACT AND OPINION These consolidated cases were assigned to Special Trial Judge Daniel J. Dinan pursuant to section 7443A(b) of the Internal Revenue Code of 1986 and Rules 180, 181, and 183. [2] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: Respondent determined the following deficiencies and additions to tax in petitioners' Federal income taxes: Taxable
Docket No.
Taxpayer
Year
Deficiency
6653(b)(1)
34413-84
Ronald G.
1983
$ 264,839.00
$ 132,420.00
Congelliere
34499-85 **
Ronald G.
1984
84,471.00
42,236.00
Congelliere
34853-85 **
Mark S.
1984
518,685.00
261,478.00
McFarlane
6432-86
Ronald G.
1984
47,461.00
23,731.00
Congelliere
Charlotte M.
1984
45,297.00
22,649.00
Congelliere
Additions to Tax, Sections
Docket No.
6653(b)(2)
6654(a)
6661
34413-84
*
$ 16,205.00
n/a   34499-85 **
*
7,497.00
8,447.00
34853-85 **
*
44,492.00
52,295.00
6432-86
*
4,039.00
4,506.00
*
3,854.00
4,289.00
*285 The issues presented for decision are: (1) whether either of the cases at docket Nos. 34499-85 or 6432-86 should be dismissed as to either petitioner Ronald Congelliere or Charlotte Congelliere or both; (2) the amount of profits petitioners Ronald Congelliere and Mark McFarlane received from their cocaine-trafficking activities for the years in issue; (3) whether petitioners Ronald and Charlotte Congelliere filed a joint return for the taxable year 1984; (4) whether petitioner Charlotte Congelliere is an innocent spouse within the meaning of section 6013(e); (5) whether petitioners Ronald Congelliere and Mark McFarlane are liable for additions to tax under section 6651(a)(1) for failure to file timely returns; (6) the number of exemptions petitioners Ronald and Charlotte Congelliere are entitled to claim for the taxable year 1984; (7) whether petitioners are liable for additions to tax for fraud, or in the alternative, for additions to tax for negligence under section 6653; *286 (8) whether petitioners are liable for additions to tax for failure to pay estimated tax under section 6654; (9) whether petitioners are liable for additions to tax for substantial understatements of tax liabilities under section 6661 for 1984; and (10) whether petitioners are liable for the maximum self-employment tax for the taxable years in issue. Petitioner Ronald Congelliere resided in the Federal Correctional Institution in Safford, Arizona, at the time he filed his petition in docket No. 34413-84. Mr. Congelliere resided at the Federal Correctional Institution in Lompoc, California, at the time he filed his petitions in docket Nos. 34499-85 and 6432-86. Petitioner Charlotte Congelliere resided in Brea, California, at the time she filed her petition herein. Petitioner Mark S. McFarlane resided in the Federal Correctional Institution, Terminal Island, San Pedro, California, at the time he filed his petition herein. FINDINGS OF FACT The deficiencies and additions to tax in issue in these cases result from respondent's determination that petitioners Ronald Congelliere and Mark McFarlane (hereinafter referred to collectively as petitioners, except where the context suggests otherwise) *287 failed to report the profits they received from trafficking in cocaine during the taxable years in issue. Petitioners purchased cocaine for resale from Charles Alan Mobley. The Federal Bureau of Investigation (FBI) undertook a widespread investigation of Mr. Mobley's cocaine-trafficking operation during 1983 and 1984. The investigation resulted in the indictments of 28 persons associated with Mr. Mobley's operations. The FBI, pursuant to a court order, placed a pen register on Mr. Mobley's home telephone. The pen register was operated from January 1, 1983 to November 9, 1983. A pen register is a device which records the time and the number dialed on outgoing calls on the telephone tapped. The FBI also operated telephone taps, pursuant to a court order, on four telephones used by Mr. Mobley to conduct his cocaine business. The first telephone tap was on Mr. Mobley's home telephone. A telephone tap records the conversation *976 of the parties to a telephone call. This tap was in operation from November 9, 1983 to January 16, 1984, and then from February 28, 1984 to April 28, 1984. The other taps were also in operation from February 28, 1984 to April 28, 1984, and were on Mr. Mobley's *288 in-laws' telephone and on two separate business telephones used by Mr. Mobley. The tapped telephone conversations were recorded on reel-to-reel tapes. Conversations that were deemed relevant by the FBI to their investigation were duplicated on separate cassette tapes. In addition, an FBI agent who was monitoring the calls would make a contemporaneous log of the telephone calls which served as an index. Mr. Mobley's primary source of cocaine was his brother-in-law, Heriberto Puerta Machado (Machado). For the most part, Mr. Mobley did not physically handle cocaine. He would send his runner, Clifford Casey, to pick up and deliver cocaine for him. Mr. Casey received a fee for his labors on a per kilogram basis. A kilogram, or kilo, equals approximately 2.2046 pounds. Mr. Casey also collected cash for Mr. Mobley from his dealers. Mr. Mobley normally sold cocaine in kilogram quantities. There is no indication that the cocaine Mr. Mobley sold to petitioners had been diluted with adulterants. The cocaine-trafficking business, as it existed in Southern California during the years in issue and as is relevant to these cases, can be generally described as follows. A wholesale dealer would *289 "front" multi-kilogram quantities of cocaine to retail dealers for a price of $ 35,000 to $ 47,000 per kilogram. This cocaine would be uncut. That dealer would then divide it up, often in quarter kilogram quantities, and sell it to his customers. The retail dealers would oftentimes "cut" the cocaine before they sold it. "Cutting" is a procedure whereby a dealer adds adulterants to the pure cocaine to increase the quantity which can be sold. Cocaine in its pure form is actually between 90-100 percent pure. Dealers often add up to one-third adulterants to the pure cocaine because the adulterants are much cheaper than the cocaine itself. This procedure makes "cutting" a very profitable procedure. However, if cocaine is plentiful -- i.e., if there is a buyers' market, as there was in Southern California during the years in issue, dealers will ordinarily not "cut" their cocaine because it would make it less attractive to prospective purchasers. The form the cocaine is in when sold may give an indication of whether it is "cut." Cocaine in solid, crystalline form ordinarily has not been "cut." Cocaine in powdery form, also referred to as "shake," may have been diluted with adulterants. *290 Accordingly, cocaine in crystalline form is relatively more valuable than cocaine in "shake" form. During the taxable years in issue a retail dealer in Southern California could expect to make a profit of between $ 5,000 to $ 9,000 per kilogram on uncut cocaine that cost him between $ 35,000 and $ 47,000. After the dealer had sold the cocaine, he would remit an amount which equaled the wholesale cost back to the wholesale dealer as part of the fronting arrangement. Drug dealers keep records of their transactions. However, those dealers who are "savvy," know that records are probative evidence of their drug activity and routinely destroy them. Furthermore, these sophisticated drug dealers hide their ledgers and the drugs themselves away from their residences and separate from each other because both are incriminating. For the same reason, a sophisticated dealer would not list the names of his customers on his ledger; he would instead write in some type of code which would represent his customers' names. Drug dealers who do business on a large scale usually do not hold other full-time jobs. They have been known to hold "front" jobs to help hide their drug activity, however. Nevertheless, *291 it would be unusual for a major drug dealer to work full time at other employment. Petitioner Ronald Congelliere was married to petitioner Charlotte Congelliere throughout the years in issue and at the time of the trial of these cases. Mr. Congelliere was self-employed as an auto-body mechanic during the years in issue. The name of his auto-body shop was Autobahn. Mrs. Congelliere was not employed outside the home during the taxable years in issue. Mrs. Congelliere maintained the household financial accounts for the family. She was under the impression that the funds which were deposited into the accounts came from her husband's autobody repair business. Mr. Congelliere reported a loss of $ 18,632.59 and a gain of $ 29,274 from his auto repair business for the taxable years 1983 and 1984, respectively. He also reported a gain of $ 30,784.45 for the taxable year 1983 from a retail jewelry business. On his 1984 return he also listed miscellaneous income in the amount of $ 8,015. The record does not indicate the source of this income. The Congellieres purchased a residence at 281 Cattail Circle in Brea, California on November 4, 1982 for $ 130,000. They made a cash down payment *292 of $ 80,000 and financed the balance ($ 50,000). Their mortgage payments on the house were $ 557.99 per month. On February 19, 1984, the Congellieres signed an offer to purchase a house at 162 Flower Hill street in Brea, California, for $ 237,900. They were to put $ 120,000 cash down and to finance the balance of $ 117,900. They wrote a deposit check to Home Savings of America, the seller, in the amount of $ 2,000 at *977 the time they signed the purchase agreement. The mortgage payments were to be $ 1,281.22 per month. The Congellieres paid a $ 50,000 down payment on the house on April 19, 1984. They deposited $ 50,000 in their bank account on April 26, 1984. Mr. Congelliere sold half his auto-body repair business, Autobahn, to his father for $ 50,000 at about the same time. The Congellieres purchased carpeting for their new residence on April 13, 1984, in the amount of $ 5,443. They also purchased, and had laid, ground tiles for their new residence on April, 16, 1984, at a total cost of $ 2,073. The closing date on their new house was to be April 25, 1984. The Congellieres resided in their new house when Mr. Congelliere was arrested on May 12, 1984. However, at the time of *293 trial, Mrs. Congelliere again resided at 281 Cattail Circle, Brea, California. The first wiretap involved in these cases was installed on November 9, 1983. It was on Mr. Mobley's home telephone. Mr. Mobley was out of the country from the end of October to November 26, 1983. The conversations that are discussed below are all taken from taped telephone conversations concerning Mr. Congelliere's cocaine-trafficking activities. Mr. Congelliere had been acquainted with Mr. Mobley for some time. They had talked on the telephone frequently during 1983, prior to the time the telephone tap was installed on Mr. Mobley's telephone. On November 27, 1983, Mr. Congelliere called Mr. Mobley and, after a lengthy conversation about a car, solicited Mr. Mobley for cocaine by stating that he would "like to look." On November 28, 1983, Mr. Congelliere called Mr. Mobley and asked, "so, what are we looking at? What's the damage?" Mr. Mobley did not know. Mr. Congelliere then said that the price would determine how much cocaine he wanted. Mr. Mobley, after some haggling, set a price of $ 42,000 per kilogram. On November 30, 1983, Mr. Congelliere called Mr. Mobley to tell Mr. Mobley how to get to the *294 auto-body shop to pick up a car that Mr. Congelliere had been restoring for Mr. Mobley. Mr. Congelliere then asked Mr. Mobley whether Mr. Mobley had something for him. Mr. Mobley said he did not. Mr. Congelliere then said that he would have to call someone else. Mr. Mobley answered that Mr. Congelliere had only been waiting for two days. Mr. Congelliere replied that he had been waiting for four days (since Mr. Mobley got back into town). Mr. Congelliere called Mr. Mobley on December 2, 1983. He asked Mr. Mobley if anything had come in yet. Mr. Mobley indicated that nothing had come in yet but that it would come in over the weekend. Mr. Congelliere then said he would go elsewhere because his customers were "starvin'" and "dying." Mr. Mobley asked Mr. Congelliere if he wanted hamburger today or steak tomorrow. On December 3, 1983, Mr. Congelliere called Mr. Mobley and told him he had purchased 250 grams of cocaine from another source. He could get only 250 grams because that is all the other source had. Mr. Congelliere went on to complain that the 250 grams did not even take care of one customer. Mr. Mobley then stated that he still did not have any cocaine. Mr. Congelliere *295 said that he was still in the market. On December 12, 1983, Mr. Congelliere called Mr. Mobley. Mr. Mobley was expecting a shipment of foreign cars at the end of the month. Mr. Congelliere quoted Mr. Mobley a price to bring the cars up to American emission standards. They talked at length about how expensive this procedure was. Towards the end of the conversation, Mr. Congelliere said he was willing to trade cocaine for his services in bringing Mr. Mobley's imported cars up to American emission standards. Mr. Mobley agreed and said that was "what makes it worth my while." On March 2, 1984, Mr. Mobley's drug courier, Clifford Casey, called Mr. Mobley to discuss a recent pickup he had made. They then went on to discuss the fees owed to Mr. Casey for the deliveries he had made. During the course of this conversation, while he was recounting how many kilograms of cocaine he had delivered he said "okay, then there was the one to George." George is the name Mr. Mobley had given to petitioner Ronald Congelliere. Mr. Mobley later stated that it was "a one-shot deal." On February 29, 1984, a person named William McCahill called Mr. Mobley and told Mr. Mobley to contact his (Mr. McCahill's) *296 runner Bob Owen because Mr. McCahill was interested in purchasing cocaine from Mr. Mobley. On March 1, 1984, Mr. Mobley called Mr. Owen to see how many kilograms of cocaine Mr. McCahill wanted. Mr. Owen said "four or five." Mr. Mobley then said that he would have his runner (Cliff Casey) contact him. Later that day, Mr. Mobley called Mr. Casey and told him to go pick up four or five kilograms of cocaine "over there." He also told Mr. Casey that he had a number for him. It was Bob Owen's number. Still later that evening Mr. Mobley called his brother-in-law, Machado, to tell him that Mr. Casey would be over to pick up five kilograms of cocaine. Mr. Machado said that there were only three left. FBI surveillance of the "stash pad" showed Mr. Casey going there and coming out with a brown paper bag. He was then seen in a parking lot down the street meeting with Mr. Owen. On March 29, 1984, Mr. Mobley called Mr. Congelliere. During the course of the conversation, Mr. Congelliere bragged to Mr. Mobley *978 that he had done two for "the kid." "The kid" was Billy McCahill. Mr. Congelliere then asked Mr. Mobley if he had given Mr. McCahill five kilograms of cocaine. Mr. Mobley said three. *297 Mr. Congelliere said he did "two-thirds of them" and that he did them for cash. He said he did this just two weeks ago. Mr. Congelliere had known Mr. McCahill for some time. In fact, they were neighbors for a time. On March 28, 1984, Mr. Mobley called Mr. Congelliere at the auto-body shop and said that there was a misunderstanding on what Mr. Congelliere owed him. He said that Mr. Congelliere owed him $ 36,000 from "way before" and that he wanted to be paid. Mr. Congelliere claimed that the $ 36,000 was going towards the house Mr. Mobley was purchasing from him. Mr. Mobley disagreed and said that the $ 36,000 was old business and that although he was giving cocaine to Mr. Congelliere in exchange for his house he still owed him (Mr. Mobley) cash for the kilogram of cocaine purchased for $ 36,000. Mr. Congelliere then said that he had to move out of the house by May 25, 1984. Mr. Mobley replied that he had offered to pay for the house all at once but that Mr. Congelliere wanted the payments spread out. He then said that he was willing to trade but that what Mr. Congelliere had already collected was still owed to him and that he still wanted to be paid. Mr. Congelliere responded *298 that he probably had $ 10,000 at that time. Mr. Congelliere said that he had already given $ 81,000 to them. He does not explain who "they" were but in all probability it was the entity that was selling Mr. Congelliere his new home. He later said that "they" would laugh at him if he were to ask for his money back. He also said that he had been out of cocaine for a week and a half and that his customers were waiting. Mr. Congelliere became very upset at the prospect of having to pay cash to Mr. Mobley for the cocaine he had previously purchased because he thought he was going to exchange his old residence, in part, for that cocaine. What made him upset was that he had used the money earned from the sale of that cocaine as a down payment on the new house. If Mr. Mobley required him to pay cash for that cocaine, he would have had to get the money back that he used as the down payment on the house. Mr. Congelliere then recounted their recent cocaine transactions. He said that Mr. Mobley gave him one kilogram of cocaine at $ 42,000 and that he still owed him $ 36,800 from "way before." The kilogram sold at $ 42,000 is in all probability the one Mr. Casey delivered to Mr. Congelliere *299 on or before March 2, 1984. The kilogram sold at $ 36,800 was sold sometime prior to March 2, 1984. It is more than likely that it was purchased in January or February of 1984. That is the same kilogram they discussed previously which was sold at a price of $ 36,000, and that they referred to as "old business." Mr. Congelliere also owed Mr. Mobley $ 2,500 for a wrecked car that he was purchasing from Mr. Mobley. Mr. Congelliere then added up everything that he owed Mr. Mobley and it came to $ 81,000 (actually $ 81,300). Mr. Congelliere also said that he was about to receive $ 50,000 from his father for a one-half interest in his auto-body repair business. Mr. Mobley seemed to accept Mr. Congelliere's representations. Mr. Mobley then ended the conversation by saying that he would put something in Mr. Congelliere's hand soon. On March 29, 1984, Mr. Congelliere called Mr. Mobley to say that the recent delivery of cocaine he received was of poor quality because it had a lot of shake in it. Mr. Mobley asked if his runner was still there. Mr. Congelliere responded that he was no longer there and that he did not have a chance to look at the cocaine until an hour after Mr. Mobley's *300 runner had left. Twenty minutes later Mr. Congelliere called Mr. Mobley back to again complain about the cocaine because it had too much shake in it. He said that he could have sold it very quickly but for the fact that it was of such poor quality. He then said that he would not even show it because it was of such poor quality. It was during this same conversation that Mr. Congelliere first broached the subject of dealing cocaine for Billy McCahill as previously set forth in these findings of fact. Later that same day Mr. Congelliere called Mr. Mobley back and again bragged about his transactions with Billy McCahill. He then asked Mr. Mobley if he had straightened out the mess with the inferior cocaine. Mr. Mobley answered that he had not. On April 3, 1984, Mr. Mobley called Mr. Congelliere to tell him that his runner would come to the auto-body shop to pick up the inferior kilogram of cocaine Mr. Congelliere still had. Mr. Congelliere then asked if the runner was bringing a better quality kilogram of cocaine to him. Mr. Mobley answered yes. Mr. Congelliere then suggested that he pay cash for the new kilogram and that he keep the inferior kilogram at a reduced price and put *301 it towards the house he was selling to Mr. Mobley. He then said that Mr. Mobley had given him $ 81,000 against the house already and that the purchase price was $ 170,000, but that he still owed $ 45,000 on the house himself. The result, he figured, was that Mr. Mobley still owed him a balance of $ 45,000 ($ 170,000 - $ 45,000 mortgage - $ 81,000 already paid approximately $ 45,000 still owed by Mr. Mobley to Mr. Congelliere). Mr. Mobley then asked what price Mr. Congelliere would pay for the next kilogram of cocaine. Mr. Congelliere said he wanted the last one (the inferior one) at a lower price and that he would pay the regular price for the next one. He then *979 said that he had been getting cocaine from Billy McCahill for $ 35,000 per kilogram. Mr. Mobley responded that it was over with Mr. McCahill. Mr. Congelliere said he wanted to do business with Mr. Mobley but that he was just trying to get the best price. Mr. Mobley then fired back, "Well it depends on what you can do. I mean you've been a one-a-monther, at best." He continued to lecture to Mr. Congelliere about his inability to sell a lot of cocaine and ended by noting that Mr. Congelliere was not exactly "Mr. *302 Potential." Mr. Congelliere then said that he had been doing two a month from Mr. McCahill and one a month from Mr. Mobley. Mr. Mobley then sarcastically answered that he believed him 100 percent. Mr. Congelliere then complained that Mr. Mobley's price had been $ 42,000 for "at least four or five times." He then mentioned a $ 53,000 price and Mr. Mobley said that it was more for him at that time also. Mr. Congelliere then said that he would stick with Mr. Mobley as his cocaine supplier. On April 10, 1984, Mr. Mobley called Mr. Congelliere to tell him that if he wanted any cocaine that he had two kilograms for him. He also asked if Mr. Congelliere had purchased any cocaine from Mr. McCahill recently because he had heard that Mr. McCahill had been "running around a little bit." Mr. Congelliere responded that he would "stay Mr. Mobley's way." Later that day Mr. Mobley called Mr. Congelliere back. Mr. Congelliere said that he wanted to pay $ 35,000 for the prior kilogram (the inferior one) and that he almost had it sold. He also said that he wanted the other two kilograms Mr. Mobley had previously offered for sale. He said he would buy one for cash and the other one would go towards *303 the house Mr. Mobley was buying from him. Mr. Mobley then asked again if he only wanted two kilograms and Mr. Congelliere responded that if he received two kilograms it would overextend him by one kilogram. Mr. Mobley then said that he would have his runner deliver them in an hour. Later that day, Mr. Mobley called his runner, Cliff Casey, and told him that "ol' George is waiting for you" and instructed Mr. Casey to "whip those two over there." In other words, Mr. Casey was to deliver two kilograms of cocaine to Mr. Congelliere. Before Mr. Casey made the delivery to Mr. Congelliere, Mr. Congelliere called Mr. Mobley back with a question of what the price was on one of the two kilograms to be delivered. It concerned the one that was to be purchased for cash because the other one would serve as the final payment on the purchase price of the house. Mr. Mobley said that it, like the one he already had, would cost $ 35,000. He also agreed that the second one that was going to be delivered would go towards payment on the house. He also said that the two that were to be delivered were a different batch from the inferior one he already had. Soon after the previous call, Cliff Casey *304 called Mr. Mobley to tell him that he had "seen George." Mr. Mobley then asked if Mr. Congelliere had given Mr. Casey anything and Mr. Casey said that he got $ 30,000. Mr. Mobley asked why he had not gotten $ 35,000 and Mr. Casey said that Mr. Congelliere had indicated that he needed to keep it for now. Mr. Mobley then said that Mr. Congelliere needed to learn to think big and referred to him as a "crawler." On April 11, 1984, Mr. Congelliere called Mr. Mobley to complain to him that one of the two kilograms recently delivered was 60-percent shake and that he wanted to trade. He also said that the other was real nice, that it was 80-percent bulk and that he already had it sold. Mr. Mobley then said that he knew that one kilogram was pretty shaky and that is why he gave him such a good price. Mr. Congelliere further complained that he had shake from before and he had shake now. He also admitted that he still had 500 grams left from the last one. He then asked Mr. Mobley if he would exchange the inferior one. He also said that he would "wholesale" off what he had left of the other one. Mr. Mobley said he would think about trading the inferior one but not before the following *305 week. On April 13, 1984, Mr. Mobley called Mr. Congelliere. Mr. Congelliere complained that it was "Friday the 13th" and that nothing had gone right all day. He said that the customer who was going to buy his good kilogram of cocaine turned it down. He also said that he had both kilograms of cocaine still sitting around. Mr. Mobley then asked Mr. Congelliere how the "flower" situation was. The term "flower" refers to marijuana. Mr. Congelliere said he had one "Z" left and that Mr. Mobley could have it if he wanted it. The term "Z" refers to one ounce. They then discussed what they were going to do about the really bad kilogram of cocaine. Mr. Mobley said that he would exchange it. Mr. Congelliere said that he could piece out the good one and agreed with Mr. Mobley to exchange the bad one. Mr. Congelliere had said earlier in the conversation that he might only make $ 500 on it. On April 23, 1984, Mr. Congelliere called Mr. Mobley and inquired about whether Mr. Mobley still planned on exchanging the bad kilogram of cocaine. Mr. Mobley said that he was still trying. On April 25, 1984, Mr. Congelliere called Mr. Mobley. Mr. Mobley had visited Mr. Congelliere's auto-body shop *306 that day for the first time but Mr. Congelliere was not there. After discussing the auto-body shop business Mr. Congelliere asked Mr. Mobley if anything was happening. Mr. Mobley said not much yet. Mr. Congelliere then said that he "got rid of half of that." He *980 also said that he had approximately 400 left. He then said that he wished he could get rid of that because he could use another one or so. Mr. Mobley then said that he was trying. On May 12, 1984, a search warrant was executed on Mr. Congelliere's residence at 162 Flower Hill Drive in Brea, California, by agents of the FBI, Drug Enforcement Administration (DEA), Internal Revenue Service, and local law enforcement officers. Among the items seized, as identified by the FBI, were a bag of marijuana, cutting paraphernalia, a drug ledger, electric digital scales, Panasonic light scope, $ 42,501 in currency found in a safe in a closet, and a kilogram of cocaine found behind a bathroom toilet. The kilogram of cocaine, as described by a DEA forensic chemist on a DEA form, was five chunks of a white crystalline substance which weighed 942.8 grams and was 94-percent pure. The form indicated that there were no adulterants in the *307 cocaine. There was no indication on the form which listed the items seized that Mr. Congelliere possessed any adulterants at the time of the search. The drug ledger contained names and figures relating to Mr. Congelliere's cocaine dealing. It also listed the figures relating to the transaction in which Mr. Mobley purchased Mr. Congelliere's house for cocaine. Mr. Congelliere's auto-body shop was also searched on May 12, 1984. He was arrested on the same date. He was later indicted on a number of counts relating to possession with intent to distribute cocaine. On November 5, 1984, Mr. Congelliere pleaded guilty to one count of possession with intent to distribute and distribution of a controlled substance, in violation of 21 U.S.C. section 841(a)(1)(1982). Mr. Congelliere was sentenced to 15 years imprisonment and 30 years special parole term. Mr. and Mrs. Congelliere filed their joint Federal income tax return for the taxable year 1983 on April 15, 1984. They claimed four exemptions on the return, one for each of themselves and one for each of their two children, Loretta and Ronald Jr. On May 12, 1984, respondent made a jeopardy assessment against Mr. Congelliere in the amount *308 of $ 262,311 in tax and $ 16,051 in penalties for the taxable period January 1, 1983 to December 31, 1983. On July 9, 1984, respondent issued a statutory notice of deficiency to Mr. Congelliere for the taxable year 1983. The amount of the deficiency and additions to tax are detailed, supra. The deficiency is predicated on respondent's determination that Mr. Congelliere sold three kilograms of cocaine per month for 12 months at a profit of $ 15,000 per kilogram for a total of $ 540,000 in unreported drug profits. Respondent did not take into account the community property laws of the state of California when determining the amount of drug profits. Furthermore, respondent gave Mr. Congelliere credit for one exemption in determining the deficiency and computed his tax liability by using married filing separately filing status. Also, on May 12, 1984, respondent terminated Mr. Congelliere's 1984 taxable year and made a termination assessment against him in the amount of $ 81,706 for the period January 1, 1984 to April 30, 1984. On April 13, 1985, Mr. and Mrs. Congelliere filed an application for automatic extension of time to file their individual income tax return for the taxable year *309 1984 to August 15, 1985 (Form 4868). The form was mailed to the Fresno Service Center. Petitioners did not estimate their tax liability on the application. On June 12, 1985, respondent issued Mr. Congelliere a statutory notice of deficiency for the taxable year 1984, the amount of which is detailed, supra. The amount of the deficiency is a result of respondent's determination that Mr. Congelliere sold three kilograms of cocaine per month for four months at a profit of $ 15,000 per kilogram for a total of $ 180,000 in drug profits. Respondent did not take into account the community property laws of the State of California when computing the deficiency in tax. Respondent gave Mr. Congelliere credit for one exemption in determining the deficiency. The notice does not indicate whether respondent determined the tax using joint return filing status, married filing separately or single status. On August 15, 1985, the Congellieres filed another application for extension of time to file their 1984 Federal income tax return until October 15, 1985 (Form 2688). This form was also mailed to the Fresno Service Center. The application was stamped "approved" by the Director of the Fresno Service *310 Center. At some point during the time the extensions were in effect, Mrs. Congelliere gathered her and her husband's books and records that were available to her and took them to their accountant to prepare the 1984 return. On October 15, 1985, Mr. and Mrs. Congelliere filed their Federal income tax return for the taxable year 1984. They elected married filing jointly filing status and claimed four exemptions, one for each of them and one for each of their two minor children, Loretta and Ronald Jr. Mrs. Congelliere signed the return herself and for Mr. Congelliere who was incarcerated at the time. It was filed with the Fresno Service Center. The applications for extensions were filed, in part, because Mrs. Congelliere had trouble gaining access to the files that the government had seized from her and her husband's home. Her *981 attorney had been unsuccessful in obtaining these documents as of April, 1988. On December 13, 1985, respondent issued statutory notices of deficiencies to both Mr. and Mrs. Congelliere for the taxable year 1984, the amounts of which are detailed, supra. The amounts of the deficiencies are a result of respondent's determination that Mr. Congelliere sold three *311 kilograms of cocaine per month for four months at a profit of $ 15,000 per kilogram for a total of $ 180,000 in drug profits. This amount was then divided in half to reflect the community property laws of the State of California. In other words, the determined unreported income of $ 180,000, stemming from Mr. Congelliere's cocaine-trafficking activities, was split 50-50 between himself and Mrs. Congelliere in the amount of $ 90,000 each. In addition, in the statutory notice of deficiency issued to Mr. Congelliere, respondent determined that he failed to report $ 19,340.50 in income from interest, Schedule C, Schedule E, and miscellaneous sources (other income). Respondent also allowed Mr. Congelliere $ 2,361.50 in excess itemized deductions and two exemptions. The total itemized deductions determined by respondent ($ 8,123) were reduced by 50 percent to reflect the community property laws of the State of California. [3] Respondent determined the deficiency using married filing separately filing status. In the statutory *312 notice of deficiency issued to Mrs. Congelliere respondent similarly determined that she failed to report $ 19,340.50 in other income but allowed her excess itemized deductions of $ 2,361.50. As in the case of Mr. Congelliere, respondent adjusted Mrs. Congelliere's itemized deductions to reflect the State of California community property laws. [4] Again, respondent allowed Mrs. Congelliere two exemptions and determined the deficiency using the married filing separately filing status. The following findings of fact are derived from taped telephone conversations concerning cocaine-trafficking activities of petitioner Mark McFarlane during the first five months of 1984. On December 27, 1983, Mr. McFarlane called Mr. Mobley and asked him if he had any "nice girls" (cocaine). Mr. Mobley indicated that he did. Mr. McFarlane asked Mr. Mobley for four kilograms. Later on December 27, 1983, Mr. McFarlane again called Mr. Mobley to ask him if he had arranged to get the cocaine yet. Mr. Mobley said "no, not until tomorrow." They then discussed some cocaine that Mr. McFarlane *313 had returned to Mr. Mobley. Mr. Mobley said that he could pick through that cocaine and come up with some good quality cocaine. Mr. McFarlane said that four or five kilograms would be fine. Mr. McFarlane wanted cocaine that was about 70-percent solid. On December 31, 1983, Mr. McFarlane called Mr. Mobley and said that he needed more cocaine because he was already "done" with the other ones. Mr. Mobley answered that he would get back to him. On January 1, 1984, Mr. McFarlane called Mr. Mobley to tell him that he would "clear you up," meaning to settle his account with Mr. Mobley. He also asked Mr. Mobley to get something together because he was "hurting bad." On January 11, 1984, Mr. McFarlane called Mr. Mobley and asked him if his runner Mr. Casey was going to contact him. Mr. Mobley said that Mr. Casey would contact him soon. On January 12, 1984, Mr. Mobley called his sister, Cindy Crowley, who kept records for him, to ask her to collect from Mr. McFarlane. Twenty minutes later, Mr. Mobley called her back to see whether she had contacted Mr. McFarlane. She said she had not. Forty minutes later Ms. Crowley called Mr. Mobley back to tell him that she had contacted Mr. McFarlane *314 and that he had $ 75,000 for him (Mr. Mobley). Ms. Crowley also relayed a message from Mr. McFarlane that Mr. Casey was going to visit him very soon and that he wanted to talk to Mr. Mobley because the "laundry was very dirty." She further stated that Mr. McFarlane had said that everything he got yesterday was dirty. On February 28, 1984, Mr. Mobley called his runner Mr. Casey and told him that "Mark" was waiting for him. Mr. Mobley then called Mr. McFarlane to tell him that Mr. Casey would be by the office soon and would have something for him to look at. Within the same general time frame, Mr. Mobley talked with his supplier, Machado, and told him that Mr. Casey would be by to pick one up. Later that evening Mr. Mobley called Mr. McFarlane to ask him about the cocaine Mr. Casey had just delivered. Mr. McFarlane said that he would take it if he could get it real cheap. He then quoted a price of $ 28,000 per kilogram and said that if Mr. Mobley agreed to that price that he would buy ten kilograms from him. He also mentioned that he was currently in possession of four kilograms. Soon thereafter, Mr. Mobley called Mr. Casey and told him to hold on to the kilogram of cocaine that *315 he showed to Mr. McFarlane and that tomorrow Mr. McFarlane would probably *982 purchase ten kilograms of cocaine if they "could work the numbers out." On February 29, 1984, Mr. Mobley called Mr. Casey to tell him that he had reached Mr. McFarlane and that Mr. McFarlane was ready. Mr. Mobley then instructed Mr. Casey to go pick up the cocaine and also to try to collect some cash from Mr. McFarlane. Mr. Mobley called Machado to tell him that Mr. Casey would be by soon to pick up cocaine. There was then a conversation between a person referred to as "Gustavo" and Machado where Mr. Machado was told that nine kilograms had been delivered. FBI surveillance had observed Mr. Casey meeting with an unidentified Latin male at an apartment complex, then going into the complex, and then exiting the complex with a 2' by 2' box which he put into his pickup, and then driving off. Mr. Casey then drove to Mr. McFarlane's office in his truck. Later Mr. Casey called Mr. Mobley to tell him that he had made the delivery to Mr. McFarlane. On March 2, 1984, Mr. McFarlane called Mr. Mobley to discuss having someone pick up money from Mr. McFarlane. They also discussed a cocaine dealer that Mr. Mobley wanted *316 Mr. McFarlane to help out. Mr. McFarlane answered that the guy owed him money and that he would not help him out. This other drug dealer owed Mr. McFarlane money because Mr. McFarlane had fronted him cocaine that he never paid for because a customer "stiffed" him. Mr. Mobley then called Mr. Casey to tell him to go over to Mr. McFarlane's office to collect from him and to then take the money directly to Mr. Mobley's supplier to pay him off. On March 15, 1984, Mr. McFarlane called Mr. Mobley to discuss a payment Mr. McFarlane owed to Mr. Mobley. However, because Mr. McFarlane had a plane to catch shortly he was unable to make the payment right then. Mr. McFarlane then suggested that his brother make the payment to Mr. Mobley or to one of his employees. On March 16, 1984, Mr. Casey called Mr. Mobley to tell him that he had not yet heard from Mr. McFarlane or any of his associates. On March 26, 1984, Mr. McFarlane called Mr. Mobley to apologize for the fact that his brother made a mistake when making a delivery of the cash Mr. McFarlane owed him. Mr. McFarlane said that he had two suitcases full of cash but that his brother only delivered one of them. The suitcase which was delivered *317 contained $ 215,000 in currency. Mr. McFarlane then said that he wanted to get to work because he had an opportunity "to do about a hundred a month" with just one guy meaning that he could sell one hundred kilograms of cocaine to one new customer. He then cautioned that he could only do this if the price was very low because this customer could get a low price elsewhere. He next told Mr. Mobley that if Mr. Mobley could not meet the price that he would have to go back east to his old suppliers. He also said that he could do this for cash up front with his own money. On March 27, 1984, Mr. Mobley called Mr. McFarlane and told him that he (Mobley) was "hungry." Mr. McFarlane answered that Jim (an associate of McFarlane's) was on his way down there. The gist of this conversation was that Mr. Mobley needed cash from Mr. McFarlane and that Mr. McFarlane had sent his associate to make a delivery of currency. On March 28, 1984, Mr. Mobley called Mr. McFarlane to ask him if his runner Mr. Casey had come by yet to pick up the cash. Mr. McFarlane said that he had but that his associate (McFarlane's) had given him too much money. Mr. McFarlane said that he owed Mr. Mobley $ 85,000 but that *318 his associate had given Mr. Casey $ 120,000 instead. Mr. McFarlane also asked Mr. Mobley if Mr. Mobley could sell him cocaine for $ 25,000 per kilogram for the prospective customer who was going to purchase 100 kilograms per month. Mr. Mobley said that price was too low. Mr. McFarlane then said that he might have to go elsewhere to purchase the cocaine. In all probability, this payment is the remaining balance that Mr. McFarlane's brother failed to make previously (the second suitcase). On April 5, 1984, Mr. McFarlane called Mr. Mobley and asked him if he had any cocaine. Mr. Mobley said that he would call him back. Soon thereafter, Mr. McFarlane called back and told Mr. Mobley that the quality of the cocaine he had just looked at was not very good. During the interim between the two calls Mr. Casey had gone over to Mr. McFarlane's to show him some cocaine. Mr. McFarlane complained that the cocaine was 80-percent shake. However, he also said that he might keep five of the ten kilograms of cocaine he looked at. Mr. Mobley said that he would have his runner bring by some new cocaine in a couple of hours. Four hours later Mr. McFarlane called Mr. Mobley back to complain about the *319 cocaine he just looked at. It seems that it was the same cocaine that he had looked at previously. Mr. McFarlane was furious; he told Mr. Mobley that if the quality of cocaine did not improve that he would go elsewhere with his business. On April 6, 1984, Mr. Casey called Mr. Mobley to explain what had gone wrong the day before with regard to delivering cocaine to Mr. McFarlane. Mr. Casey said that he thought that he was supposed to show the same cocaine to Mr. McFarlane because he thought Mr. McFarlane wanted to take a portion of the cocaine he had previously shown him. Mr. Mobley said he *983 had calmed Mr. McFarlane down and had then sold him a Porsche. On April 7, 1984, Mr. Mobley called Luis Fernando Machado, Herberto Machado's brother, to arrange a meeting. Three minutes later Mr. Mobley called Mr. Casey and told him to be at a predesignated meeting place shortly to look at some cocaine. Mr. Casey was supposed to evaluate the cocaine and then report back to Mr. Mobley. One-half hour later Mr. Mobley called Luis Fernando Machado to tell him that Mr. Casey was going to the meeting place. Forty-five minutes later Mr. Casey called Mr. Mobley back to report to him that the cocaine *320 he had just looked at was "more like it." It had a better percentage -- meaning less shake. FBI surveillance had witnessed Mr. Casey meeting with Heriberto Puerta Machado at the designated place. Mr. Mobley then called Luis Fernando Machado to tell him that everything looked good. He later ordered 27 kilograms of cocaine from him. Mr. Mobley then telephoned Mr. McFarlane to tell him that a shipment of cocaine would be delivered to him at his office shortly. On April 8, 1984, Mr. McFarlane called Mr. Mobley to tell him that he wanted to purchase the cocaine that he just looked at. Mr. McFarlane also said that he wanted as low a price as possible. Mr. Mobley said he would call him back. On April 9, 1984, Mr. Mobley called Mr. Casey. Mr. Casey said that Mr. McFarlane took all but three of the kilograms that he looked at. Mr. McFarlane did not accept the other three kilograms because they were 80/20, 80-percent solid and 20-percent powder. Mr. Mobley and Mr. Casey also discussed Mr. Casey returning a quantity of cocaine to the Machados. On April 10, 1984, Mr. Mobley called Mr. McFarlane. Mr. McFarlane asked if Mr. Mobley was going to send his runner over to pick up some cash. *321 Mr. Mobley asked if Mr. McFarlane had finished selling the cocaine he had obtained from Mr. Mobley. Mr. McFarlane said that he had not. Mr. McFarlane then said that he had purchased 24 kilograms from Mr. Mobley. He complained that it was hard work to sell 24 kilograms of cocaine quickly. Since Mr. Mobley wanted to be paid right away Mr. McFarlane offered to pay a higher price than $ 28,000 so that he would not have to pay right away. It is unclear whether Mr. Mobley agreed to this arrangement. On April 17, 1984, Mr. Mobley called Mr. Casey. Mr. Casey said that Mr. McFarlane only had half of the money that he was supposed to have. On April 26, 1984, Mr. Mobley called for Mr. McFarlane. One of Mr. McFarlane's associates, Jim Wolf, answered the telephone. He said that Mr. McFarlane was out of town. He also said that he had some money for Mr. Casey to pick up. Mr. McFarlane was indicted on various charges of possession of cocaine with intent to distribute along with the other 27 confederates in the Mobley group. On November 5, 1984, Mr. McFarlane pleaded guilty to two counts of possession with intent to distribute and distribution of a controlled substance, in violation of 21 U.S.C. section 841(a)(1) (1982) *322 and two counts of aiding and abetting in violation of 18 U.S.C. section 2 (1982). Each aiding and abetting count was charged within the possession with intent to distribute count. Mr. McFarlane was sentenced to imprisonment for 15 years on the first count and 10 years on the second count. The two terms were to run consecutively and not concurrently. He was also sentenced to 40 years' special parole term. OPINION Before we reach the substantive issues in these cases regarding petitioners' tax liabilities, we have a procedural matter to dispose of -- namely, whether either of the cases at docket Nos. 34499-85 or 6432-86 should be dismissed as to either Mr. or Mrs. Congelliere or both. A problem exists regarding the Congellieres' petitions for the taxable year 1984 because a termination assessment was made against Mr. Congelliere but not Mrs. Congelliere and because applications for extensions of time to file their 1984 Federal income tax return were mailed to a Service Center instead of to the District Director. A quick review of the pertinent facts should help shed some light on the genesis of this procedural issue. On May 12, 1984, respondent terminated Mr. Congelliere's 1984 *323 taxable year and made a termination assessment against him. On April 13, 1985, Mr. and Mrs. Congelliere filed an application to extend the time to file their 1984 tax return to August 15, 1985, with the Fresno Service Center. Respondent, unaware that Mr. Congelliere had filed for an extension of time to file his 1984 return, issued him a statutory notice of deficiency for the taxable year 1984 on June 12, 1985 (within 60 days of the due date of the return, assuming no application for extension of time had been filed). No notice was issued to Mrs. Congelliere in June, 1985. The notice issued to Mr. Congelliere on June 12, 1985, hereinafter will be referred to as the June notice. On August 15, 1985, Mr. and Mrs. Congelliere filed another application to extend the time in which to file their 1984 return to October 15, 1985. This application, which was mailed to the Fresno Service Center, was approved by its Director. On October 15, 1985, Mr. and Mrs. Congelliere filed their 1984 Federal *984 income tax return. It was mailed to the Fresno Service Center. On December 13, 1985, respondent issued separate statutory notices of deficiencies to Mr. and Mrs. Congelliere for the taxable year *324 1984 (which was within 60 days of the due date of the return, taking into account the two extensions of time to file, and the date on which the Congellieres filed their return for that year). The notices of deficiencies issued on December 13, 1985, hereinafter will be referred to as the December notices. Section 6851 authorizes respondent to terminate a taxpayer's taxable year, assuming certain criteria are met, and to immediately assess the tax he determines to be due as of that date, on that date. Respondent must then issue a statutory notice of deficiency relating to the year in which the termination took place:
within 60 days after the later of (i) the due date of the taxpayer's return for such taxable year (determined with regard to any extensions), or (ii) the date such taxpayer files such return. [Section 6851(b); see also section 1.6851-1(b), Income Tax Regs.]
Accordingly, which of the two docketed cases relating to Mr. Congelliere's 1984 taxable year is valid [5] depends upon whether respondent had to issue the statutory notice of deficiency within 60 days of April 15, 1985, or within 60 days of October 15, 1985. This question itself turns on whether the two applications for *325 extensions of time to file a return filed by Mr. Congelliere are themselves valid. An application for an extension of time in which to file a Federal income tax return under the authority of section 6081 must be mailed to the same internal revenue officer with whom the return is required to be filed. Section 1.6081-1(b)(1), Income Tax Regs. In other words, the application for extension of time to file, must be filed where the return must be filed. Section 6091(b)(1)(B)(v) expressly gives the Secretary the authority to designate where a return must be filed by a person who was subject to a termination assessment with respect to the taxable year. The Secretary, in Treasury Decision 7575 (1979-1 C.B. 442), promulgated final regulations at section 1.6091-2(f)(1), Income Tax Regs., which states that the return of a person who was subject to a termination assessment with respect *326 to the taxable year must file said return with the District Director and not with the Service Center. The reason the return must be filed with the District Director and not the Service Center is that the District Director is the administrator who has the responsibility for making the termination assessment and then for issuing the statutory notice of deficiency to the taxpayer within 60 days after the taxpayer files his return for the terminated year. Section 1.6851-1(a) and (b), Income Tax Regs.
These procedures concerning termination assessments are very detailed and specific and are designed to allow the taxpayer to quickly petition the Tax Court for a redetermination of the deficiency underlying the termination assessment after the close of the taxable year. To that end, the District Director needs to know when to issue the notice. He cannot concern himself with trying to discover applications for extensions of time filed in the wrong place. Mr. Congelliere erred in filing his two applications for extensions of time with the Service Center rather than with the District Director. Accordingly, we hold that the applications for extensions of time are invalid ab initio for the purpose *327 of determining the time frame in which respondent should have issued a statutory notice of deficiency for the taxable year in which he made a termination assessment against Mr. Congelliere. Therefore, for purposes of clause (i) of section 6851(b), the due date of Mr. Congelliere's return for the taxable year 1984 was April 15, 1985. However, clause (ii) of section 6851(b) gives as an alternative the date the return is filed. Furthermore, the pertinent date in section 6851(b) is the later of the due date of the return or the date the return is actually filed. [6] Mr. Congelliere's 1984 Federal income tax return was filed on October 15, 1985. Should that then be the relevant date after which the statutory notice of deficiency must be issued for the termination year? We think that in this case the answer is no. The reasoning that we used to disregard the extensions applies equally to *328 the return itself. That is, since the return was not filed in the proper place, it should be disregarded for the purposes of determining when the 60-day period for issuing the statutory notice of deficiency for the termination year begins to run. [7]
*985 Consequently, the statutory notice of deficiency issued to Mr. Congelliere for the taxable year 1984 on June 12, 1985, is timely because it was issued within 60 days of the due date of the return, April 15, 1985. Mr. and Mrs. Congelliere filed a petition with this Court based on the June notice (docket No. 34499-85). However, since no notice was issued to Mrs. Congelliere from which she could have filed a petition with this Court at docket No. 34499-85, she will be dismissed as a petitioner in that case. Furthermore, Mr. and Mrs. Congelliere filed a petition with this Court at docket No. 6432-86 as a result of the December notice. *329 As for Mrs. Congelliere, the notice is valid, and her petition was timely filed so it will not be disturbed. However, section 6212(c) generally provides that if the Secretary has mailed to the taxpayer a notice of deficiency as provided in section 6212(a), and the taxpayer files a petition with this Court within the time prescribed in section 6213(a), the Secretary shall have no right to determine any additional deficiency of income tax for the same taxable year. Because we have found that the statutory notice of deficiency issued to Mr. Congelliere for the taxable year 1984 on June 12, 1985, was valid and because Mr. Congelliere timely filed his petition in this Court from the June notice, the December notice was invalid as to Mr. Congelliere. Section 6212(c); section 301.6212-1(c), Proced. & Admin. Regs. The petition filed at docket No. 6432-86, therefore, will be dismissed as to Mr. Congelliere. The net result is that Mr. and Mrs. Congelliere's 1984 taxable year is still properly in issue in these cases, albeit at different docket numbers. Having disposed of this preliminary procedural matter, we are now ready to proceed to the substantive issues in these cases regarding petitioners' *330 tax liabilities for the years in issue. Respondent's deficiency determination in his statutory notice of deficiency is presumed to be correct. Petitioners must prove by a preponderance of the evidence that respondent erred in his determination. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). However, in cases where respondent's determination of a deficiency is based on alleged unreported income from an illicit activity, the Ninth Circuit [8] requires respondent to come forward with some evidence linking the taxpayer to the illicit activity. Weimerskirch v. Commissioner, 596 F.2d 358, 360 (9th Cir. 1979), revg. 67 T.C. 672 (1977). Once respondent satisfies this requirement, however, the burden of going forward is upon the taxpayer who ultimately bears the burden of proving that respondent's determination is in error. Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985), affg. an unreported Tax Court decision. The evidence *331 in these consolidated cases clearly links petitioners to the narcotics trafficking activity that respondent based his deficiencies on in the statutory notices of deficiencies issued to them in these cases. Petitioners were convicted on charges stemming from their cocaine sales during the taxable years in question. There are also in evidence numerous taped telephone conversations which patently reveal petitioners cocaine-trafficking activities. Those conversations reveal requests by them for kilogram quantities of cocaine from their wholesale supplier, deliveries of those kilograms, cash payments for those kilograms and discussions of resales by petitioners. Furthermore, as to Mr. Congelliere, it was shown that he had possession of a kilogram of cocaine and $ 42,000 in currency at the time of his arrest. See Avery v. Commissioner, 574 F.2d 467 (9th Cir. 1978), affg. a Memorandum Opinion of this Court, cited in Weimerskirch v. Commissioner, supra at 360 n. 7. We must now decide whether respondent erred in determining that petitioners failed to report as gross income profits they derived from their cocaine-trafficking activities during the taxable years in issue. Gross income includes *332 income from whatever source derived. Section 61. This includes income derived from illegal sources. James v. United States, 366 U.S. 213 (1961). All of the evidence introduced at trial dealt with petitioners' purchases of cocaine from a wholesale supplier. Obviously, this in itself would not produce profits. The profits come when petitioners resell the cocaine to their customers. There is no direct evidence of these sales. But we know that these sales took place because petitioners routinely paid cash to Mr. Mobley that they had obtained from their customers. They also often spoke of having disposed of the cocaine they had and needing more to sell. We take this to mean that they were selling what they had purchased. Along that same line, we are mindful of the fact that petitioners would not have continued to purchase cocaine if they were not selling what they already had in stock. *986 We will begin with Mr. Congelliere's cocaine-trafficking activities. Respondent based his deficiencies on a determination that Mr. Congelliere sold three kilograms of cocaine per month for a profit of $ 15,000 per kilogram throughout the taxable year 1983 and the first four months of the taxable year *333 1984. Because respondent's determination for the taxable year 1983 (or at least for the first 11 months thereof) results from an extrapolation of the figures he determined for the period of November 27, 1983 to May 12, 1984, we will begin our analysis with petitioners activities during this later time frame. The first transaction involving Mr. Congelliere occurred sometime between December 3, 1983 and December 12, 1983. We know this because prior to December 12, 1983, Mr. Congelliere had been soliciting Mr. Mobley for cocaine. However, in a conversation that occurred on December 12th, Mr. Congelliere indicated that he had sold whatever he had obtained from Mr. Mobley and was ready to purchase another kilogram of cocaine. Accordingly, we find that Mr. Congelliere had purchased one kilogram of cocaine from Mr. Mobley in early December, 1983, because, as will be seen later, that was the normal quantity that he purchased. The price quoted to Mr. Congelliere for this kilogram by Mr. Mobley was $ 42,000. Furthermore, Mr. Congelliere spoke of purchasing another 250 grams (1/4 kilogram) during the time he was waiting for Mr. Mobley to sell him the kilogram previously discussed. Accordingly, *334 we find that Mr. Congelliere also purchased this additional quarter kilogram in early December 1983. The next taped telephone conversation regarding Mr. Congelliere's wholesale cocaine purchases occurred on March 2, 1984, when Clifford Casey, Mr. Mobley's drug courier, reminded Mr. Mobley that there "was the one to George." George is the name Mr. Mobley used when referring to Mr. Congelliere. We find that the "one to George" is a kilogram of cocaine delivered to Mr. Congelliere by Mr. Casey because that is the context in which the conversation between Mr. Casey and Mr. Mobley took place. This kilogram of cocaine was delivered to Mr. Congelliere sometime during the later part of February 1984. During a conversation that occurred on March 28, 1984, Mr. Congelliere recounted his recent transactions with Mr. Mobley in the context of determining how much Mr. Mobley had paid towards the house he was purchasing from Mr. Congelliere. In that conversation he said that he had recently purchased a kilogram from Mr. Mobley at $ 42,000. We find from that conversation that the kilogram which cost $ 42,000 was the "one to George" that Mr. Casey had delivered to Mr. Congelliere during the later *335 part of February. Also, during the same conversation, Mr. Congelliere spoke of a kilogram that he had purchased from Mr. Mobley at $ 36,800 prior to the time he had purchased the kilogram at $ 42,000. Since we know that he paid $ 42,000 for the kilogram he purchased in early December 1983, the kilogram purchased for $ 36,800 could not be the same kilogram purchased in December. We also know that Mr. Mobley was out of the country for over a month prior to December 1983, so it is unlikely that the kilogram purchased for $ 36,800 was purchased in October 1983 or before. That leaves us with the time period January to February 1984. While we do not know when, during this time frame, Mr. Congelliere purchased the kilogram at $ 36,800 we are confident that he did in fact purchase a kilogram at that price during that period of time. The next kilogram of cocaine Mr. Congelliere purchased from Mr. Mobley was delivered to Mr. Congelliere on March 29, 1984. However, shortly after the delivery Mr. Congelliere called Mr. Mobley to complain that the quality of that kilogram was poor because it had too much "shake" in it. At first Mr. Congelliere wanted Mr. Mobley to exchange it for better *336 quality cocaine. However, a week later Mr. Congelliere decided to-keep it because Mr. Mobley sold it to him at a reduced price of $ 35,000. On April 10, 1984, Mr. Congelliere received two more kilograms of cocaine from Mr. Mobley via his runner Clifford Casey. These kilograms also cost Mr. Congelliere $ 35,000 each. Mr. Congelliere was to pay for one of them in cash and the other one was to go towards the house he was selling to Mr. Mobley. The next day Mr. Congelliere called Mr. Mobley to again complain that the cocaine he had just received was inferior because it also had too much "shake" in it. He said that he already had the better of the two sold but that he wanted to exchange the poorer quality kilogram. He also said that he still had 500 grams of the kilogram left that he received on March 29, 1984. Two days later Mr. Congelliere called Mr. Mobley to complain that he was unable to sell the better of the two kilograms he had just received because the buyer backed out. He then admitted that he still had possession of the two kilograms. Mr. Mobley agreed to exchange the poorer quality kilogram of cocaine. Mr. Congelliere still had possession of the inferior kilogram as of *337 April 23, 1984. However, as of April 25, 1984, Mr. Congelliere only had one half of that inferior kilogram left and was ready for another one. Mr. Mobley said that he was just about ready to deliver another kilogram of cocaine to Mr. Congelliere. Mr. Congelliere was arrested on May 12, 1984. He had in his possession one kilogram of cocaine that was in a chunky crystalline form. *987 This had to have been a new kilogram of cocaine recently delivered to Mr. Congelliere because it was chunky and not "shaky" as was the last one he had and because there was an entire kilogram there when he only had half a kilogram left from the last one. In all, during the period December, 1983 to May 12, 1984, the telephone taps show that Mr. Congelliere purchased seven kilograms of cocaine from Mr. Mobley and one quarter kilogram from another source, or, in other words, seven and one quarter kilograms in five and one-half months. This is a significantly lower amount from the volume of three kilograms per month determined by respondent in his notices of deficiencies issued to Mr. Congelliere for the taxable years 1983 and 1984. Respondent argues that the difference is due to the fact that Mr. Congelliere *338 also sold two kilograms of cocaine per month which he obtained from Billy McCahill. He evidently bases this argument on the fact that Mr. Congelliere bragged to Mr. Mobley during a taped telephone conversation on March 29, 1984, that he had purchased two kilograms from Mr. McCahill at a price which was lower than what he had been paying Mr. Mobley. Mr. McCahill had purchased three kilograms from Mr. Mobley on March 1, 1984. Those three kilograms were the only cocaine Mr. Mobley ever sold to Mr. McCahill. Mr. Congelliere argues that he was merely "puffing" when he told Mr. Mobley that he had purchased cocaine from Mr. McCahill. We agree with Mr. Congelliere. It is illogical to assume that Mr. Congelliere would purchase cocaine at a much higher price ($ 42,000 versus $ 35,000) from Mr. Mobley if he could get it from a cheaper source. Furthermore, a review of the taped conversations between Mr. Congelliere and Mr. Mobley clearly shows that Mr. Congelliere often had to wait many days for a delivery of cocaine after he had ordered it. And, oftentimes it was of inferior quality. Yet, Mr. Congelliere kept going back for more. We doubt that had Mr. Congelliere been able to purchase *339 kilogram quantities of cocaine elsewhere he would have put up with Mr. Mobley and his high prices, inferior quality, and slow service. Mr. Congelliere was also able to do business with Mr. Mobley by exchanging the equity in his house and his skills as an auto-body mechanic for cocaine. Obviously, he could only sell his house to one drug dealer. Also, the fact that Mr. Mobley dealt in expensive imported automobiles made him well suited to the exchange of cocaine for Mr. Congelliere's skills as an auto-body mechanic. While the foregoing reasons are probative of Mr. Congelliere's relationship with Mr. Mobley, the most telling evidence of Mr. Congelliere's dependence on Mr. Mobley as his supplier is revealed at the beginning of the telephone taps when Mr. Mobley first got back in town. Mr. Congelliere called Mr. Mobley on November 27, 1983, to solicit him for cocaine. Five days later Mr. Mobley still had not delivered any cocaine to Mr. Congelliere. Mr. Congelliere complained that he would have to go elsewhere to obtain cocaine because his customers were getting very anxious. Now, had Mr. Congelliere had other suppliers we assume he would have exhausted all avenues to obtain cocaine *340 for his customers. However, he was only able to gather up a quarter kilogram from another source, not even enough for one customer. He then had to wait until approximately December 12, 1983, for Mr. Mobley to make a delivery of cocaine. We think that this episode shows that Mr. Congelliere depended on Mr. Mobley for his supply of cocaine. It could be argued that even if Mr. Congelliere only purchased cocaine from Mr. Mobley, that he could have purchased much more cocaine than the tapes indicate. While possible, we think that it is not probable given the evidence we have before us. For example, Mr. Mobley referred to Mr. Congelliere as George -- clearly not a name that conjures up visions of a big time drug dealer. He also called Mr. Congelliere a "crawler" and exclaimed on one occasion that he and Mr. Casey had to teach Mr. Congelliere to "think big." He also, through his manner and tone, consistently treated Mr. Congelliere as an insignificant customer. However, the most telling evidence of Mr. Congelliere's level of drug activity may be inferred from the fact that Mr. Mobley told him that he was not exactly "Mr. Potential" and that he "was a one a monther at best." Also, on another *341 occasion (April 10, 1984), Mr. Congelliere ordered two kilograms of cocaine which he said over-extended him by one kilogram. Other evidence of Mr. Congelliere's level of activity includes the fact that he kept his stash of cocaine at his residence in plain sight instead of having it hidden elsewhere, the fact that he kept a ledger of his customers with their names on it, and the fact that he kept large amounts of currency and various cocaine dealer tools at his residence near his ledger and near his stash of cocaine. These are all indications that he was an amateurish dealer. We are also persuaded that Mr. Congelliere was not a very successful drug dealer by the fact that he had a full-time job as an auto-body mechanic. Persons who are successful, wealthy drug dealers usually do not have to hold down a full-time job to support themselves. Accordingly, since respondent's own evidence introduced at trial shows that Mr. Congelliere sold on average only one and one third kilograms of cocaine per month, we find that respondent erred in determining that Mr. Congelliere sold *988 three kilograms of cocaine per month. Additionally, since one of the kilograms of cocaine that Mr. Congelliere had *342 purchased for resale was seized in a search of his residence, he obviously could not have sold it so we will subtract that from the number sold. As a result, we find that Mr. Congelliere sold six and one quarter kilograms of cocaine during the period November 1983 to May 12, 1984. One and one quarter of those sales are properly taxable in the year 1983 and five of those sales are properly taxable in the year 1984. As previously mentioned, no evidence was introduced at trial concerning Mr. Congelliere's cocaine trafficking during the first eleven months of the taxable year 1983. Respondent applied his determination of Mr. Congelliere's cocaine trafficking for the period the telephone taps were operating to the period January 1, 1983 to November, 1983. Mr. Congelliere has the burden of proving that respondent erred by doing so. Unfortunately for him, he has failed to prove that respondent erred in assuming that he was a cocaine dealer throughout 1983, or that he was a lower level dealer during that time. While we realize that it is difficult for a taxpayer to prove that he didn't engage in an activity, we insist that the taxpayer come forward with some evidence proving that he *343 did not do what respondent determined he did. Therefore, we sustain respondent's determination that Mr. Congelliere was a cocaine dealer throughout the taxable year 1983. And, having found that Mr. Congelliere sold an average of one and one-third kilograms of cocaine per month, we find that he sold 14-2/3 kilograms of cocaine during the first eleven months of the taxable year 1983 (11 months X 1-1/3 per month). We now must decide the amount of profits Mr. Congelliere earned in selling cocaine. Respondent determined that Mr. Congelliere earned $ 15,000 per kilogram in profits. An expert for Mr. Congelliere, Gerald Scotti, testified that a cocaine dealer in Mr. Congelliere's position would earn between $ 5,000 and $ 9,000 per kilogram in profits. He assumed that the cocaine sold was not diluted with adulterants. Mr. Scotti proved to be a most informed witness for Mr. Congelliere. Because of his extensive experience as a former DEA agent, he was clearly knowledgeable about the prices of cocaine and the profits earned from the sales of cocaine. Mr. Scotti testified that a cocaine dealer in Mr. Congelliere's position would earn a profit of between $ 5,000 and $ 9,000 per kilogram of *344 cocaine. We found Mr. Scotti to be an informed and persuasive witness. Furthermore, we find that allegations of Mr. Congelliere cutting his cocaine are unfounded. The cocaine seized at his residence was uncut and there was no evidence that he was in possession of adulterants at the time his house was searched. The market in Southern California was flooded with cocaine during the period in issue which would make cut cocaine much less marketable. In conclusion, using our best judgement, and in light of all the surrounding facts and circumstances, we find that Mr. Congelliere earned $ 7,000 in profits per kilogram of cocaine sold during the years in issue. Having found how many kilograms Mr. Congelliere sold during the taxable years in issue and having found what the profit per kilogram was, we can now decide how much income Mr. Congelliere earned from selling cocaine. In 1983, he sold 14-2/3 kilograms during the first eleven months and 1-1/4 kilograms during the last month for a total of 15-11/12 kilograms. At a profit of $ 7,000 per kilogram he earned a total of $ 111,440 during the taxable year 1983. In 1984, he sold five kilograms of cocaine at a profit of $ 7,000 per kilogram *345 for a total of $ 35,000. We must now decide how the community property *989 laws of the State of California affect Mr. and Mrs. Congellieres' Federal tax liabilities for 1983 and 1984. In the statutory notice of deficiency issued to Mr. Congelliere for the taxable year 1983, respondent did not take into account the community property laws of the State of California when determining Mr. Congelliere's deficiency in tax. Respondent did not issue a statutory notice of deficiency to Mrs. Congelliere for the taxable year 1983. In the June statutory notice of deficiency issued to Mr. Congelliere for the taxable year 1984, respondent did not take into account the community property laws of the State of California when determining the deficiency in his tax. However, in the December statutory notice of deficiency issued to Mrs. Congelliere for the taxable year 1984, respondent did take into account the community property laws of the State of California when determining the deficiencies in her tax. A spouse residing in a community property state such as California has ownership rights in one-half of all of both spouses' community income, California Civil Code section 5105 (West 1983), and generally *346 must report that one-half share as taxable income. United States v. Malcolm, 282 U.S. 792 (1931); Poe v. Seaborn, 282 U.S. 101 (1930); see also United States v. Mitchell, 403 U.S. 190 (1971). This is true regardless of whether the spouse actually "receives" his/her share of such income. Kimes v. Commissioner, 55 T.C. 774, 782 (1971). Nothing has been brought to our attention which would cause us not to apply this rule to the drug income received by Mr. Congelliere. Accordingly, under the community property laws of the State of California, we find that Mr. Congelliere is liable for a tax on one-half of the $ 111,440 he received during the taxable year 1983 or $ 55,720 and one-half of the $ 35,000 he received during the taxable year 1984 or $ 17,500. Mrs. Congelliere is also liable for a tax on one-half of the $ 35,000 received during the taxable year 1984, or $ 17,500. We now turn to the question of whether respondent erred in determining that petitioner Mark McFarlane failed to report income received from trafficking in cocaine during the taxable year 1984. Respondent determined that Mr. McFarlane sold 2.5 kilograms of cocaine per week for 17 weeks during the taxable year 1984 *347 for a total of 42.5 kilograms. Respondent further determined that Mr. McFarlane received a profit of $ 25,000 per kilogram for a total of $ 1,062,500 in unreported drug profits. The first taped telephone conversation regarding Mr. McFarlane occurred on December 27, 1983, when Mr. McFarlane asked Mr. Mobley if he had any "nice girls." The term "nice girls" is a street name for cocaine. Mr. McFarlane indicated that he wanted four kilograms that were about 70-percent solid. Mr. Mobley said that he would pick over some cocaine that he already had and come up with enough for Mr. McFarlane. Four days later, Mr. McFarlane told Mr. Mobley that he sold the four kilograms and that he needed some more. It is evident from these conversations that Mr. McFarlane obtained four kilograms of cocaine between December 27, 1984 and December 31, 1984. The next day, January 1, 1984, Mr. McFarlane told Mr. Mobley that he would clear up his account with him. He also asked Mr. Mobley if he had any cocaine. While it is obvious that this transaction took place in a year prior to the taxable year in issue, we do not know precisely when Mr. McFarlane resold the cocaine or collected the money. In short, nothing *348 has been brought to our attention to prove to us the proper year of inclusion for this item of income. Respondent determined that the year of inclusion was the taxable year 1984. Since petitioner has the burden of proving that respondent erred in his determination, it is petitioner who must prove to us which is the proper year in which to include the drug income, and since he has not done so we must uphold respondent's determination that the proper year is the taxable year 1984. On January 11, 1984, Mr. McFarlane told Mr. Mobley that he was still waiting. On January 12, 1984, Mr. McFarlane told Mr. Mobley's sister, Cindy Crowley, that he had $ 75,000 for Mr. Mobley. Mr. McFarlane also told Ms. Crowley that he had obtained cocaine from Mr. Mobley's runner, Clifford Casey, the day before (January 11, 1984). It is unclear from the record how many kilograms of cocaine Mr. McFarlane obtained on January 11, 1984. We cannot determine from this record whether the $ 75,000 payment was for the cocaine obtained on December 27, 1983 or January 11, 1984. We do know that Mr. McFarlane generally paid less than $ 30,000 per kilogram so the $ 75,000 payment probably represented two to three *349 kilograms of cocaine. On February 28, 1984, Mr. Casey went to Mr. McFarlane's office to show him a kilogram of cocaine. Later that day Mr. McFarlane told Mr. Mobley that, having viewed the cocaine, he would purchase ten kilograms if he could purchase it at $ 28,000 per kilogram. Mr. McFarlane also said he was still in possession of four kilograms of cocaine. These four kilograms probably were not from the January 11, 1984, delivery because Mr. McFarlane generally was able to get rid of his cocaine quickly. We believe that these four kilograms were from a separate transaction. The next day Mr. Casey delivered ten kilograms of cocaine to Mr. McFarlane. Sometime between March 16, 1984 and March 26, 1984, Mr. McFarlane's brother made a cash payment to Mr. Mobley in the amount of $ 215,000. The payment was made in currency and was delivered in a suitcase. However, the brother made a mistake because he was supposed to deliver two suitcases full of currency -- not one. On March 26, 1984, Mr. McFarlane told Mr. Mobley that he was ready to deal again and had a potential new customer who would purchase 100 kilograms per month. On March 28, 1984, an associate of Mr. McFarlane's made a currency *350 delivery to Mr. Casey in the amount of $ 120,000. However, the associate was only supposed to make a delivery of $ 85,000. This payment is the amount Mr. McFarlane's brother was supposed to deliver previously. These two payments totaling $ 300,000 were for the ten kilograms purchased by Mr. McFarlane on February 28th. The excess of $ 20,000 ($ 300,000 - (10 kilograms x $ 28,000 per kilogram)) was probably for a previous purchase. On April 5, 1984, Mr. McFarlane looked at ten kilograms of cocaine that Mr. Casey had brought by. Mr. McFarlane did not purchase any of this cocaine because it was too poor in quality. On April 8, 1984, Mr. McFarlane looked at 27 kilograms of cocaine that Mr. Casey had brought by. He ended up taking 24 of those kilograms. On April 10, 1984, Mr. Mobley asked Mr. McFarlane if he had sold all 24 kilograms. Mr. McFarlane indicated that he had not because it took time to sell that many kilograms. He paid $ 28,000 per kilogram for that cocaine. *990 On April 17, 1984, Mr. McFarlane paid a portion of the money he owed Mr. Mobley. On April 26, 1984, an associate of Mr. McFarlane's made another payment to Mr. Mobley. In conclusion, the evidence clearly shows that *351 Mr. McFarlane purchased 42 kilograms of cocaine. Furthermore, it is unclear how much Mr. McFarlane obtained on January 11, 1984. We know that it was a multi-kilogram amount because he normally purchased more than one kilogram at a time. Accordingly, because the evidence introduced at trial adequately supports respondent's determination that Mr. McFarlane sold 42.5 kilograms of cocaine during the taxable year 1984, we find for respondent on the issue of volume. We must next decide the amount of profits Mr. McFarlane received from the sale of the 42.5 kilograms of cocaine. Respondent determined in his statutory notice of deficiency that Mr. McFarlane made a profit of $ 25,000 per kilogram. In deciding whether this amount is accurate we will again turn to Mr. Scotti's expert testimony. Even though he was an expert for Mr. Congelliere, his testimony pertained to the same time period at issue in Mr. McFarlane's case and his testimony is helpful to us in addressing ourselves to Mr. McFarlane's cocaine-trafficking activities. Mr. Scotti testified that a dealer who purchased a kilogram of cocaine for a price of between $ 35,000 to $ 47,000 would earn a profit of between $ 5,000 to $ 9,000 *352 on the resale of that cocaine. This assumes that the cocaine would not be cut. In arriving at these figures, Mr. Scotti also assumed that his hypothetical dealer would resell the kilogram of cocaine in smaller quantities, typically one quarter kilograms. Mr. McFarlane is somewhat different from the drug dealer whom Mr. Scotti told us about. We believe that these differences are substantial enough to warrant further analysis of Mr. Scotti's opinion as to the profits earned from dealing cocaine. The areas where Mr. McFarlane's activities may have been different from Mr. Scotti's hypothetical cocaine dealer are, one, that Mr. McFarlane purchased cocaine from Mr. Mobley for much less than $ 35,000 per kilogram, and two, that he probably resold his cocaine in larger than one-quarter kilogram quantities. For the reasons that follow, we believe that the two differences are interrelated and that they affect profitability. Mr. Congelliere purchased one-kilogram quantities of cocaine from Mr. Mobley which he then sold in smaller quantities to his customers. Because he was a low-level dealer he had to pay premium prices for his cocaine. In many of the transactions documented in these cases, *353 he had to pay $ 42,000 per kilogram for cocaine. Contrast this to Mr. McFarlane who purchased two dozen kilograms of cocaine from Mr. Mobley at a price of $ 28,000 per kilogram in a single transaction. In all likelihood, Mr. McFarlane then sold the cocaine to dealers like Mr. Congelliere, that is, he resold the cocaine in larger quantities to his customers who then resold it again themselves in smaller quantities. In other words, he was one step higher on the drug dealer ladder than Mr. Congelliere. This observation is again supported by a conversation between Mr. Mobley and an unrelated third-party drug dealer. This third-party drug dealer was talking to Mr. Mobley because he wanted to purchase cocaine from Mr. Mobley to resell. Mr. Mobley was trying to convince Mr. McFarlane to take the third-party drug dealer on as a customer. Mr. McFarlane declined to do so because this other drug dealer still owed Mr. McFarlane money from a previous transaction. Even though Mr. McFarlane did no further business with this other drug dealer, it shows that other dealers were trying to purchase cocaine from Mr. McFarlane. In a separate conversation, Mr. McFarlane told Mr. Mobley that he might *354 be able to sell one hundred kilograms per month to a new customer. Although there is no proof that this ever happened, it does indicate that Mr. McFarlane had the capability of selling large quantities of cocaine. Both of these differences persuade us that Mr. McFarlane was selling to other dealers, often smaller dealers, who themselves then sold the cocaine in smaller quantities. Another difference which persuades us that Mr. McFarlane was a much larger dealer than Mr. Congelliere is that Mr. Congelliere had to work full time as an auto-body mechanic while Mr. McFarlane lived comfortably, without any other visible means of support. Using the figures discussed above, if Mr. McFarlane could purchase cocaine from Mr. Mobley for $ 28,000 per kilogram and then sell it in kilogram quantities for $ 35,000 to $ 47,000 per kilogram, he could make a profit of $ 7,000 to $ 19,000 per kilogram. This is still consistent with Mr. Scotti's opinion that a cocaine dealer could make a profit of between $ 5,000 and $ 9,000 per kilogram. Again, the difference can by explained by the fact that, because Mr. McFarlane purchased cocaine in large numbers, he could buy it cheaper and because he resold it to *355 dealers, he could sell it in larger quantities. Another factor which helps persuade us that Mr. McFarlane resold the cocaine at the high end of Mr. Scotti's quoted prices is the fact that Mr. McFarlane's customers in all likelihood were persons who did not have enough connections to deal with someone such as Mr. Mobley themselves. Again, we turn to the third-party drug dealer mentioned, supra. This drug dealer's *991 statements were recorded in a conversation he had with Mr. Mobley. This drug dealer wanted Mr. Mobley to persuade Mr. McFarlane to start dealing with him again. He also asked Mr. Mobley if he would deal directly with him. Mr. Mobley emphatically said no. This shows us that Mr. Mobley generally would not personally deal with small-time drug dealers. It also shows us that a small-time drug dealer was dependent on a dealer like Mr. McFarlane for his supply and because of that dependence had to pay top prices. Consistent with this observation is the fact that the more removed a purchaser is from the source, the more expensive the cocaine. At first blush our opinion regarding Mr. McFarlane's drug-dealing activities may appear to be inconsistent with our opinion regarding *356 Mr. Congelliere's activities who was a small-time drug dealer. How could Mr. Congelliere deal directly with some one like Mr. Mobley who obviously dealt in large quantities of cocaine? We believe the answer to the hypothetical question lies in the fact that Mr. Congelliere had something else to offer Mr. Mobley. That something else is the fact that Mr. Congelliere could exchange his services as an auto-body mechanic and his first house for cocaine. For that reason, Mr. Mobley may have put up with Mr. Congelliere's small-time operation where he normally would not have done so. In conclusion, using our best judgment, and in light of all the surrounding facts and circumstances, we find that Mr. McFarlane earned a profit of $ 15,000 per kilogram of cocaine sold. Then, to arrive at his total profits from selling cocaine we must multiply the quantity sold of 42.5 kilograms by the profit per kilogram of $ 15,000 to arrive at a total of $ 637,500. The next issue presented for decision is whether Mr. and Mrs. Congelliere were entitled to file a joint Federal income tax return for each of the taxable years in issue. Section 6013 allows a husband and wife to make a single joint return of their *357 income taxes. Mr. and Mrs. Congelliere filed a timely joint Federal income tax return for the taxable year 1983. However, respondent calculated Mr. Congelliere's deficiency in tax for the taxable year 1983 using married filing separately filing status. He obviously erred in doing so. Accordingly, in his Rule 155 computations, respondent must calculate Mr. Congelliere's deficiency in tax for the taxable year 1983 using married filing jointly filing status. Furthermore, in his Rule 155 computations, respondent must take into account the number of exemptions listed on the 1983 return. Respondent also determined the deficiencies in both Mr. and Mrs. Congelliere's income tax for the taxable year 1984 using married filing separately filing status. Mr. and Mrs. Congelliere filed a joint return for the taxable year 1984 on October 15, 1985. They had not previously filed separate returns for that year. Mr. Congelliere had received a statutory notice of deficiency for the taxable year 1984 and had filed a petition with the Court prior to the time he filed the joint return. It is well settled that if a taxpayer has filed a separate return, he may not then elect joint filing status for the *358 same taxable year after he has filed a petition with this Court in response to a notice of deficiency for that taxable year. Section 6013(b)(2)(C). However, if a taxpayer has not previously filed a separate return, he may file a joint return for the taxable year after a petition has been filed with this Court (but before the case is submitted for decision) for the same taxable year. Phillips v. Commissioner, 86 T.C. 433, 441 (1986) (Court reviewed), affd. on this issue 851 F.2d 1492 (D.C. Cir. 1988). Accordingly, since Mr. and Mrs. Congelliere had not previously filed separate returns, the joint return they filed for the taxable year 1984 will be recognized as a joint return. [9] *359 Respondent, in his Rule 155 computations, must calculate the deficiencies in both Mr. and Mrs. Congelliere's tax for the taxable year 1984 using married filing jointly filing status. The next issue presented for decision is whether petitioner Charlotte Congelliere is an innocent spouse within the meaning of section 6013(e). A husband and wife who file a joint return are jointly and severally liable for the tax due. Section 6013(d)(3). However, if a spouse meets the following four requirements, the spouse is an "innocent spouse" and is not jointly and severally liable for the tax attributable to omitted items. The requirements are:
(1) A joint return has been made under this section for a taxable year, (2) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (3) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and *992 (4) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement. [Section 6013(e)(1). [10] *360 ]
A grossly erroneous item includes gross income omitted from the return. Section 6013(e)(2)(A). The understatement is substantial if it exceeds $ 500. Section 6013(e)(3). Petitioners bear the burden of establishing that each of the four requirements of section 6013(e) has been satisfied. Flynn v. Commissioner, 93 T.C. 355, 359 (1989). In the instant case, Mrs. Congelliere has satisfied the first two requirements of section 6013(e) because she filed a joint return and because the unreported drug profits are grossly erroneous items. What is in issue is whether in signing the return she did not know or had no reason to know of the omission and whether it would be inequitable to hold her liable for the deficiency attributable to the omission. Whether a spouse knows or has reason to know of the omission is essentially factual, and the test to be applied is what a reasonably prudent person would or should know of the circumstances, keeping in mind such person's level of intelligence, education and experience. Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), *361 affg. on this issue a Memorandum Opinion of this Court. Estate of Jackson v. Commissioner, 72 T.C. 356 (1979). Furthermore, the requisite knowledge is not of the tax implications of the circumstances which give rise to the omission, but rather the circumstances themselves. Purcell v. Commissioner, 86 T.C. 228, 238 (1986), affd. 826 F.2d 470 (6th Cir. 1987); Bokom v. Commissioner, 94 T.C. No. 11 (filed 2/28/90). In the instant cases it is obvious to us that Mrs. Congelliere knew of Mr. Congelliere's drug activities when she signed the joint return. Mr. Congelliere's cocaine trafficking took place beginning in 1983. He was arrested on May 12, 1984; he was indicated on a variety of counts relating to his drug dealing and he was convicted on counts relating to drug dealing on November 5, 1984. On the date of Mr. Congelliere's arrest, Mr. and Mrs. Congelliere's residence was searched. During the course of the search the agents discovered a kilogram of cocaine. It was in plain sight in the bathroom. Given these facts, Mrs. Congelliere had to have known that Mr. Congelliere was a drug dealer during the taxable year 1984. Mrs. Congelliere did not sign the joint tax return for the taxable *362 year 1984 until on or about October 15, 1985. She knew he was a drug dealer when she signed the return. Accordingly, since she knew of the facts giving rise to the omission of income at the time she signed the return, she is not an innocent spouse within the meaning of section 6013(e). Because we have found that she knew or should have known of the omission, we need not reach the issue of whether it would be inequitable to hold her liable for the deficiency. The next issue presented for decision is whether any or all petitioners are liable for an addition to tax for fraud under section 6653(b). Respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b). To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner, 80 T.C. 1111 (1983). The existence of fraud is a question of fact to be resolved from the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). *363 Fraud is not to be imputed or presumed. Beaver v. Commissioner , 55 T.C. 85, 92 (1970). However, fraud may be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Rowlee v. Commissioner, supra.The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C 213, 223-224 (1971). The intent to conceal or mislead may be inferred from a pattern of conduct. Spies v. United States, 317 U.S. 492, 499 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. Holland v. United States, 348 U.S. 121, 137 (1954). However, the mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner, 301 F. 2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. Other badges of fraud, as summarized by the Ninth Circuit, include: maintaining inadequate records; failing to file income tax returns; giving implausible or inconsistent explanations of behavior; concealing assets; failing to cooperate with tax authorities; engaging in illegal *364 activities; attempting to conceal illegal activities; dealing in cash; and failing to make estimated *993 tax payments. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. We will first decide whether Mr. McFarlane is liable for an addition to tax for fraud. Mr. McFarlane engaged in an illegal profit seeking activity, drug dealing. Because trafficking in cocaine is patently illegal, Mr. McFarlane sought to conceal his activities. He did this by not keeping any records, by dealing in cash, and by conducting transactions surreptitiously. Unfortunately for him, he did not conceal his activities well enough because he was convicted of trafficking in cocaine and now resides in a Federal Correctional Institution. The evidence introduced at trial shows that Mr. McFarlane dealt in large quantities of currency. On one occasion he made a $ 75,000 payment in currency, on another occasion he paid a $ 300,000 debt with payments of $ 215,000 and $ 120,000 in currency (the sum of those two amounts exceeds $ 300,000 because his associate accidently made a $ 120,000 payment instead of an $ 85,000 payment). Furthermore, Mr. McFarlane did not *365 file any income tax return for the taxable year in issue on his own accord nor did he file Federal income tax returns for many years prior to 1984. He only agreed to file tax returns because it was part of his plea bargain agreement. There is no indication that he reported income from any of his drug activities on his income tax returns even though he received $ 637,500 in profits during the taxable year 1984. In conclusion, respondent has met his burden of proving fraud because he has shown by clear and convincing evidence that Mr. McFarlane intentionally engaged in a course of conduct designed to conceal, mislead, and otherwise prevent the collection of taxes. Therefore Mr. McFarlane is liable for an addition to tax for fraud for the taxable year 1984. We next turn to the question of whether Mr. Congelliere is liable for an addition to tax for fraud for the taxable years 1983 and 1984. The evidence introduced at trial against Mr. Congelliere is similar to that introduced against Mr. McFarlane. Mr. Congelliere also engaged in an illegal profit-seeking activity, drug dealing. Mr. Congelliere also attempted to conceal his cocaine-trafficking activities by not keeping records, *366 dealing in cash, and conducting transactions surreptitiously. Although Mr. Congelliere did have some records of his activities, they were not prepared to record his business activities for tax purposes. He only kept the records to keep track of those who owed him money. And the only reason respondent was able to see those records is because they were discovered in a search of Mr. Congelliere's residence. Mr. Congelliere also dealt in large volumes of currency. He did this because cash does not leave a trail which would lead authorities to discover his cocaine-trafficking activities. Also, like Mr. McFarlane, Mr. Congelliere was not very good at concealing his cocaine-trafficking activities because he was convicted of drug dealing. Mr. Congelliere also tried to launder his drug profits by purchasing cocaine in exchange for the equity in his house and by exchanging his services as an auto-body mechanic for the purchase of cocaine. This enabled Mr. Congelliere to earn income without paying tax on it because there was no record of his cocaine trafficking which would notify anyone that he was earning income from it. In conclusion, respondent has met his burden of proving fraud because *367 he has shown by clear and convincing evidence that Mr. Congelliere intentionally engaged in a course of conduct designed to conceal, mislead and otherwise prevent the collection of taxes. Therefore, Mr. Congelliere is liable for additions to tax for fraud for the taxable years 1983 and 1984. We next turn to Mrs. Congelliere to decide whether she is liable for an addition to tax for fraud. Mrs. Congelliere is not liable for an addition to tax for fraud merely because she filed a joint return with Mr. Congelliere who committed fraud. Section 6653(b)(4). Respondent must prove that Mrs. Congelliere herself engaged in some type of fraudulent conduct. Section 301.6653-1(f), Proced. & Admin. Regs.; Stone v. Commissioner, 56 T.C. 213, 227 (1971). There is no indication from the evidence in this record that Mrs. Congelliere was involved in her husband's cocaine-trafficking enterprise in any way. She, herself, did not undertake any activity which would lead us to believe that she had an intent to evade tax. The mere fact that she was aware of her husband's activities at the time she signed the return does not change the result. We will not infer intent to evade tax from her passive knowledge. *368 Respondent has failed to prove by any evidence whatsoever that Mrs. Congelliere is subject to the addition to tax for fraud for the year 1984 and we so hold. The next issue presented for decision is whether any of the petitioners are liable for an addition to tax for negligence or disregard of rules and regulations under section 6653(a). This addition to tax was set forth in the alternative to the addition to tax for fraud. Having found that Mr. McFarlane and Mr. Congelliere are liable for fraud, they cannot be liable for an addition to tax for negligence. Section 6653(b)(3). *994 Without considering the gravamen of the addition to tax pursuant to section 6653(a) as to petitioner Charlotte M. Congelliere, who filed a joint return with her husband Ronald G. Congelliere for the year 1984, since we have found that Ronald G. Congelliere is liable for the addition to tax under section 6653(b) for the year 1984, we will not apply the addition to tax under section 6653(a) as to Charlotte M. Congelliere for that year. The next issue presented for decision is whether either Mr. Congelliere and/or Mr. McFarlane is liable for an addition to tax under section 6651(a)(1) for failure to file a timely *369 return. While it appears that respondent abandoned this issue at trial, the issue has been rendered moot because we have found that both Mr. Congelliere and Mr. McFarlane are liable for an addition to tax for fraud. And, since a taxpayer cannot be assessed for an addition to tax for failure to file a return, if that taxpayer has been assessed for an addition to tax for fraud, section 6653(d), neither Mr. Congelliere nor Mr. McFarlane can be assessed for an addition to tax for failure to file. The next issue presented for decision is the number of exemptions Mr. and Mrs. Congelliere are entitled to for the taxable year 1984. They claimed four exemptions on their return. In their pleadings they state that they made a mistake by not including their newborn son. They attached his birth certificate to their petition. They are clearly entitled to five exemptions on their 1984 return. The next issue presented for decision is whether petitioners are liable for an addition to tax for failure to make estimated tax payments. As to Mr. McFarlane, no evidence has been introduced to refute the correctness of respondent's determination on this issue. Accordingly, respondent is sustained on *370 this issue. Similarly, as to Mr. and Mrs. Congelliere, no evidence has been introduced to disprove the correctness of respondent's determination on this issue. We would note, however, that Mr. and Mrs. Congelliere included a failure to pay estimated tax penalty with their 1984 return. Respondent must take that into account when making his Rule 155 calculations. Otherwise, he is sustained on this issue. The next issue presented for decision is whether petitioners are liable for an addition to tax under section 6661 for a substantial understatement of tax liability. Section 6661 provides for an addition to tax if there is a substantial understatement of tax. Section 6661(a). The Omnibus Budget Reconciliation Act of 1986 increased the rate at which the addition to tax pursuant to section 6661 was imposed from 10 percent to 25 percent for additions to tax assessed after October 21, 1986. Pallottini v. Commissioner, 90 T.C. 498 (1988). There is an understatement of tax under this section if the amount required to be shown on the return exceeds the amount actually shown on the return. Section 6661(b)(2)(A). In the case of individuals the understatement is substantial if it exceeds *371 the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Section 6661(b)(1). The amount of the understatement is reduced if there is substantial authority for tax treatment of the item or if the relevant facts affecting the item are adequately disclosed on the return. Section 6661(b)(2)(B). As for Mr. McFarlane, section 6661 clearly applies because he failed to file a return, making the amount shown on the return zero, yet he owed a large tax liability for the taxable year. As for Mr. and Mrs. Congelliere, section 6661 also applies because the amount required to be shown on their returns exceeds the amount shown on the returns by enough to make it a substantial understatement within the meaning of section 6661(b)(1). Furthermore, the relevant facts are not disclosed on the return nor is there substantial authority for the omission. However, in his Rule 155 computations, respondent must take into account the income stated on the return. Accordingly, the understatement is limited to the tax on the unreported drug profits. Respondent, in his statutory notices of deficiencies, determined the additions to tax under section 6661 using the 10-percent rate. *372 However, in his brief he argues that the 25-percent rate should be used. This change was not pleaded by respondent nor did he prove that the assessments of this tax occurred after October 21, 1986. Therefore, respondent is limited to the 10-percent rate. See Jones v. Commissioner, T.C. Memo. 1988-373. The last issue presented for decision is whether petitioners are liable for the maximum self-employment tax for the taxable years in issue. Petitioners have not offered any evidence which would show that respondent erred in his determination on this issue. Accordingly, respondent is sustained on this issue. To reflect the foregoing, An order will be entered dismissing docket No. 34499-85 as to Charlotte Congelliere and docket No. 6432-86 as to Ronald Congelliere, and decisions will then be entered under Rule 155.
Footnotes
1. The following cases were consolidated herewith for trial, briefing and opinion: Ronald G. Congelliere, docket No. 34499-85; Mark S. McFarlane, docket No. 34853-85, and Ronald G. Congelliere and Charlotte M. Congelliere, docket No. 6432-86.↩
2. All subsequent section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50% of the interest that is computed on the portion of the underpayment which is attributable to fraud. ** Respondent also determined that petitioner is liable for an addition to tax for failure to file under section 6651.↩
3. The allowed excess itemized deductions and other income listed on the notice are reported on the joint return that Mr. and Mrs. Congelliere filed for the taxable year 1984.↩
4. These two items are similarly reported on Mr. and Mrs. Congellieres' joint income tax return for the taxable year 1984.↩
5. By the term "valid," we mean which notice was properly issued by virture of section 6851. We have previously held that the failure to properly issue a notice within the guidelines of section 6851 does not invalidate the notice for jurisdictional purposes. Ramirez v. Commissioner, 87 T.C. 643, 648-649↩ (1986).
6. There is some question as to whether clause (ii) of section 6851(b) only applies if the return is timely filed. See Perlowin v. Sassi, 711 F.2d 910↩ (9th Cir. 1983). Because of our resolution of the issue we need not decide the question of whether this clause only applies if the return is timely filed.
7. We note that we are disregarding Mr. Congelliere's applications for extensions of time to file his return and the return itself solely for the purpose of determining when the District Director must issue the statutory notice of deficiency for the taxable year 1984 (the termination year) to Mr. Congelliere.↩
8. Since these cases are appealable to the Ninth Circuit, barring a stipulation to the contrary, we will follow decisions of the Ninth Circuit. Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940↩ (1971).
9. Respondent did not take into account Mr. and Mrs. Congellieres' 1984 return when determining their deficiency in tax for the taxable year 1984. Respondent included items in the notice of deficiency (excess itemized deductions and other income) which were reported on the return. Since these were reported they cannot be part of the deficiency. Accordingly, in his Rule 155 computations, respondent must delete these items from the deficiency so that they will not be counted twice.
10. The Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801-802, amended section 6013(e)↩ retroactively to all years to which the Internal Revenue Code of 1954 applies.